IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35410-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CURTIS C. ANDERSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Curtis Anderson appeals his conviction of one count of violation of a no-contact order, committed against a family or household member. The State concedes that evidence at a CrR 3.5 hearing was insufficient to support the trial court's finding that incriminating statements Mr. Anderson made to police while in custody were voluntarily and knowingly made. Although the State argues that the error was harmless, we disagree and hold that a new trial is required. While that issue is dispositive, we address one other of Mr. Anderson's assignments of error, alleged prosecutorial misconduct, that we fear might otherwise be repeated on retrial.

FACTS AND PROCEDURAL BACKGROUND

Early one morning in February 2017, Robert Delp, who lived at 1616 North Cedar Street in Spokane, called the county's Crime Check hotline after seeing a man looking into parked cars on the street. Mr. Delp later testified that he confronted the man, who pulled out a "hunting knife" and then walked north on Cedar Street. Report of Proceedings (RP) at 93. He described the man as wearing blue jeans, a dark jacket, and a black baseball cap with an orange symbol on it. The man was wearing a bandana across his face so, as Mr. Delp later testified, he could not see his face. Officer Trevor Winters responded to Mr. Delp's call at approximately 7:00 a.m. but was unable to locate anyone in the vicinity who met Mr. Delp's description.

Around 8:30 the same morning, police received another call reporting a person rummaging through a car a couple of blocks from Mr. Delp's home. Officer Winters returned to the area and this time sighted Curtis Anderson on Walnut Street, just south of an alleyway between Augusta and Nora Streets. Mr. Anderson was wearing clothing consistent with Mr. Delp's description. Officer Winters asked to speak with Mr. Anderson and then, when he saw that he had a knife in a sheath on his belt, asked him to sit on a nearby porch, knowing that other officers were responding. Mr. Anderson was compliant.

Mr. Anderson gave his name and date of birth when asked, and Officer Winters used the information to do a record and warrant check. He learned that a court order

2

prohibited Mr. Anderson from being within two blocks of the home of Mr. Anderson's mother, Kary Curtis, who lived at 1322 West Spofford Avenue. Based on the officer's conclusion that he and Mr. Anderson were then "[a]pproximately two blocks" from Ms. Curtis's home and that Mr. Anderson would have been even closer to her home if he was the person sighted by Mr. Delp, he questioned Mr. Anderson about the possible no-contact violation. RP at 110. According to Officer Winters, Mr. Anderson denied being at his mother's home the night before or that day, but when asked if he had been involved in an altercation with someone at 1616 North Cedar, he admitted he had exchanged words with someone while walking by that location.

Coincidentally, as Officer Winters spoke with Mr. Anderson, David Curtis, Kary Curtis's husband, called police to report a possible burglary the night before at their Spofford Avenue home. Mr. Curtis had discovered an open gate and that a bathroom window on the ground floor was open and its screen was cut. A large overturned bucket was on the ground outside the window and footprints in the snow led to the bucket. Officer Nicholas Spolski responded to Mr. Curtis's call. He notified Officer Winters of what he learned from Mr. Curtis.

The officers decided to take Mr. Anderson to Mr. Delp's home for a field showup. As Mr. Delp described the showup at trial, he stood on his porch with Officer Winters while Officer Spolski had Mr. Anderson, who was handcuffed, step out of a patrol car located about a half a block away. Mr. Delp testified that he told officers he could not

make a facial identification, but that Mr. Anderson's clothes and backpack matched those of the man he had seen. By the time Mr. Anderson was presented to Mr. Delp, Officer Winters had relieved Mr. Anderson of his knife and he was not wearing the sheath, so Mr. Delp made no identification of those items. The knife taken from Mr. Anderson was not admitted into evidence or identified at trial.

The officers did not have Mr. Anderson speak, so Mr. Delp made no voice identification. When cross-examined at trial, Mr. Delp acknowledged that it was just beginning to get light when he had the encounter with the suspected vehicle prowler, that the encounter lasted about 10 seconds, and that he could not describe the suspect's height, weight, or hair color.

Following the showup, Officer Spolski told Mr. Anderson that his shoe prints matched those seen in the snow at the Curtis home and that Mr. Delp placed him in the area. Officer Spolski claims that in response, Mr. Anderson told the officer that he "had gone to his mom's house because he was cold and hungry." RP at 138.

Mr. Anderson was charged with one count of felony violation of a no-contact order, domestic violence. The prohibition language from the order, which was admitted as an exhibit at trial, stated:

4

2. **Defendant:**
   A. do not cause, attempt, or threaten to cause bodily injury to, assault, sexually assault, harass, stalk, or keep under surveillance the protected person.
   B. do not contact the protected person, directly, indirectly, in person or through others, by phone, mail, or electronic means, except for mailing or service of process of court documents through a third party, or contact by the defendant's lawyers.
   C. do not knowingly enter, remain, or come within 2 Blks (1,000 feet if no distance entered) of the protected person's residence, school, workplace, other: 1322 Spofford Ave
   D. other: or any known location Spokane, WA

Ex. 1.

The trial court conducted a CrR 3.5 hearing on the admissibility of Mr.

Anderson's statements to police on the first day of trial. Officer Winters was called by

the State and provided the following testimony about advising Mr. Anderson of his rights

after stopping him on Walnut Street:

> A. He was detained at that time. He was not placed under arrest.
>
> Q. Did you speak to him?
>
> A. Yes, I did.
>
> Q. Did he appear to want to speak to you?
>
> A. I advised him of his Miranda[1] rights, which he stated he understood. And then he waived his rights and was willing to talk to me.
>
> Q. So you did advise him of his rights at that time?
>
> A. Sorry. Prior to advising him of his rights, I asked him what he was doing. He said he was checking on that vehicle. He said he believed it was abandoned and was just making sure no one else had broken into it.

RP at 40.

During cross-examination, defense counsel presented and Officer Winters

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

identified a department issued card printed with a warning of constitutional rights. The card was not offered or admitted into evidence. Officer Winters reiterated that he "personally read [Mr. Anderson] his rights" but then stated, "I do not recall if I used a card or if I said the rights from memory." RP at 58. He acknowledged that Mr. Anderson had not signed a constitutional rights card and had not been presented with one. The officer later testified that the cards might not even have been printed and available at the time of Mr. Anderson's detention, adding, "I gave him a verbal admonishment." RP at 63.

Mr. Anderson testified at the hearing that the officer who stopped him was not Officer Winters. He denied that any officer advised him of his *Miranda* rights and denied that he was within two blocks of his mother's home as charged.

The trial court suppressed only the statements made by Mr. Anderson before the point at which Officer Winters claims to have read or recited *Miranda* warnings. The court found that the officer provided *Miranda* warnings early in the men's encounter. It ruled all of Mr. Anderson's post-*Miranda* statements admissible, stating, in part:

> The officer testified that he read those—he recited those rights or read them. He wasn't certain that he recited them from memory, and there was no questioning about that. There was no question that this court is aware of that those rights were incorrectly or improperly provided.

RP at 74.

6

At trial, the defense focused on weaknesses in Mr. Delp's identification of Mr. Anderson and whether—if Mr. Anderson was *not* the man seen by Mr. Delp—the State had proved that Mr. Anderson was ever within two blocks of his mother's home.

Officer Winters testified that the location where he stopped Mr. Anderson was within two blocks of Ms. Curtis's home. But Mr. Curtis testified that a person would have to travel three blocks to arrive at the location. Defense counsel questioned witnesses with a map that was referred to as "Defendant's Exhibit No. 1," but she never offered it in evidence.[2] RP at 127.

During closing argument, the prosecutor argued that Mr. Anderson knowingly violated the provisions of the no-contact order, relying on Mr. Delp's identification of

---

[2] We take judicial notice that had a map been admitted, it would have revealed the following locations of the relevant homes and detention:



7

Mr. Anderson as the suspected prowler, Officer Winters's detention of Mr. Anderson on Walnut Street, Mr. Anderson's admission to Officer Spolski that he went to his mother's home, and the footprints in the snow in the Curtises' yard. The prosecutor pointed jurors to an instruction that knowingly performing an act is established if the person performs the act intentionally and told the jury, "whatever we do, we do intentionally." RP at 164. He offered as an example the jurors' "intentional" appearance in response to their jury summonses. The defense did not object.

The jury found Mr. Anderson guilty of the sole count of felony violation of a no-contact order and that the crime was committed against a family or household member. The trial court sentenced Mr. Anderson to 60 months' confinement and at the request of Mr. Anderson's mother, modified the no-contact order to permit them to communicate.

Mr. Anderson appeals.

ANALYSIS

Mr. Anderson makes 10 assignments of error. Four relate to the trial court's ruling that Mr. Anderson's statements to police were admissible, including an assignment of error to the trial court's failure to enter findings of fact and conclusions of law following the CrR 3.5 hearing. Because we conclude that a new trial is required in light of the nonharmless error in admitting Mr. Anderson's statements, we address only (1) that issue, (2) the challenge to the no-contact order on constitutional vagueness grounds, and

(3) a contention of prosecutorial misconduct for conflating intentional action with knowing action that we fear might otherwise be repeated on retrial.

We first address the vagueness challenge, then address our conclusion that the admission of Mr. Anderson's statements to police was not harmless, and turn last to the confusion over the required element that the violation of a no-contact order be "knowing."

### *A vagueness challenge to the no-contact order was not preserved*

If Mr. Anderson's vagueness challenge to the no-contact order was successful, we would direct the trial court to dismiss the charge against him, so we address that asserted error first. Mr. Anderson argues the order is unconstitutionally vague because the handwritten "2 blk" in the order is illegible and "two blocks" is not a sufficiently definite description of the area he was prohibited from entering. Clerk's Papers (CP) at 3.

RAP 2.5(a) states the general rule that appellate courts will not entertain issues not raised in the trial court. *State v. Guzman Nunez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988), *aff'd*, 174 Wn.2d 707, 285 P.3d 21 (2012)). The reason for this rule is to afford the trial court an opportunity to correct errors as they are raised, thereby preserving the use of judicial resources. *Scott*, 110 Wn.2d at 685. Mr. Anderson did not testify at trial. His lawyer did not challenge the no-contact order as unconstitutionally vague.

9

RAP 2.5(a)(3) permits a party to raise an unpreserved claim of "manifest error affecting a constitutional right." To establish manifest constitutional error, a criminal defendant must identify a constitutional error and make a showing that the error negatively affected his rights at trial. *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). "It is this showing of actual prejudice that makes the error 'manifest,' allowing appellate review." *Id.* at 927 (citing *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)). "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." *McFarland*, 127 Wn.2d at 333.

The due process vagueness doctrine under the Fourteenth Amendment to the United States Constitution and article I, section 3 of the state constitution requires that citizens have fair warning of proscribed conduct. *State v. Bahl*, 164 Wn.2d 739, 752, 193 P.3d 678 (2008). The same vagueness doctrine that applies to statutes applies to protection or no-contact orders whose violation could result in criminal penalties. *E.g.*, *City of Seattle v. May*, 171 Wn.2d 847, 855-56, 256 P.3d 1161 (2011). Such an order is unconstitutionally vague if it is either insufficiently definite such that ordinary people cannot understand what conduct is proscribed, or if it does not provide ascertainable standards of guilt to protect against arbitrary enforcement. *Bahl*, 164 Wn.2d at 752-53. Mr. Anderson relies on the former infirmity: he argues that his no-contact order was unconstitutionally indefinite.

In a case addressing an allegedly vague statute, the United States Supreme Court has held that the degree of vagueness that the Constitution tolerates, as well as the relative importance of fair notice and fair enforcement, depends in part on the nature of the enactment. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982). We find that the distinctions identified in *Hoffman Estates* also have relevance where a court order imposed against a particular defendant is alleged to be unconstitutionally vague. The Court explained that economic regulations are subject to a less strict vagueness test because their subject matter is often more narrow and a regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry.[3] Here, the no-contact order had a very narrow subject matter and was completed in the presence of Mr. Anderson, who signed it. The handwritten two block prohibited zone might even have been requested by Mr. Anderson or his lawyer as easier to comply with than the default prohibited zone of 1,000 feet provided by the standard no-contact order form. *See* Ex. 1. The meaning of the two

---

[3] This court has likewise held that when a court order applicable to a particular defendant is challenged as unconstitutionally vague, the fact that the defendant actually understands what is prohibited is a sufficient response to the challenge. In *State v. Weatherwax*, for instance, this court cited *United States v. Soltero*, 510 F.3d 858 (9th Cir. 2007), for the proposition that a condition forbidding a defendant from wearing or possessing items connoting affiliation with a particular gang was not insufficiently definite for that defendant, who was an admitted member of the gang and presumably familiar with its paraphernalia. *Weatherwax*, 193 Wn. App. 667, 678, 376 P.3d 1150 (2016), *rev'd on other grounds*, 188 Wn.2d 139, 392 P.3d 1054 (2017).

block zone might well have been discussed at the hearing at which the no-contact order was entered.

*Hoffman Estates* also observes that the Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." 455 U.S. at 499. As observed in *Screws v. United States*, "The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. *But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.*" 325 U.S. 91, 102, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945) (plurality opinion) (emphasis added). In Mr. Anderson's case, the State would not meet its burden of proving the essential element of a "knowing violation" without satisfying jurors beyond a reasonable doubt that Mr. Anderson knew what the no-contact order prohibited.

Mr. Anderson's first vagueness challenge to the no-contact order—that the handwritten "2 blk" is illegible—does not qualify as manifest constitutional error because the trial court heard Mr. Anderson's testimony at the CrR 3.5 hearing that he knew the no-contact order prohibited him from coming within two blocks of his mother's home.

His second objection to the order—that "two blocks" is not a sufficiently definite description of the prohibited area—fails because facts necessary to adjudicate the claimed error are not in the record on appeal. At trial, Mr. Anderson did not challenge the no-

contact order as unconstitutionally vague. He argued, principally, that it described the

number of linear blocks that someone traveling on public streets or walkways must travel,

which he contended was three.[4] As defense counsel argued in closing, "what we heard is

that, to get from the Spofford address, you had to go up one block to the intersection of

Augusta, cross the street, go up another block to get to the intersection of Nora and

Cedar, and then head one block west to get to the intersection of Walnut and Nora."

RP at 171.

The no-contact order was in evidence but no evidence was presented of what

transpired at the hearing at which the order was entered, which Mr. Anderson attended.

Because facts necessary to determine what Mr. Anderson actually understood about the

two block zone are not in the record, no actual prejudice is shown and the error is not

manifest.

*Admitting Mr. Anderson's incriminating admissions was not harmless error*

The State concedes that Mr. Anderson's statements were admitted in violation of

his constitutional rights. We are not required to accept a concession we determine is

---

[4] The field of mathematics has names for describing this method for measuring distance. *See, e.g.*, "*Taxicab geometry*," WIKIPEDIA, https://en.wikipedia.org/wiki /Taxicab_geometry (last visited on Oct. 24, 2018). Notably, among the names for this type of distance measurement are the "taxicab metric," "city block distance," or "Manhattan distance." *Id.* "City block distance" is distinguished from Euclidean geometry, which appears to have been Officer Winters's basis for estimating that the location where he stopped Mr. Anderson was within two spatial blocks of Ms. Curtis's home.

erroneous, however. *State v. Nysta*, 168 Wn. App. 30, 44, 275 P.3d 1162 (2012).

*Miranda* warnings are designed to protect a defendant's right not to make incriminating statements while in the potentially coercive environment of custodial police interrogation. *State v. Harris*, 106 Wn.2d 784, 789, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940, 107 S. Ct. 1592, 94 L. Ed. 2d 781 (1987). Unless a defendant has been given *Miranda* warnings, his statements during police interrogation are presumed to be involuntary. *State v. Sargent*, 111 Wn.2d 641, 647-48, 762 P.2d 1127 (1988). Unwarned statements must therefore be excluded from evidence under *Miranda*. *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). We review the adequacy of *Miranda* warnings de novo. *State v. Hopkins*, 134 Wn. App. 780, 785, 142 P.3d 1104 (2006).

Mr. Anderson was not presented with a written *Miranda* warning admitted into evidence, so the adequacy of the warnings depends on what Officer Winters said to Mr. Anderson. If the officer read from a card, the record does not reveal what the card said. The officer's testimony suggests it was more likely he recited the rights from memory, but he was never asked to repeat his memorized recital at trial. In short, no evidence was presented from which to determine the adequacy of any warnings that were given. We therefore accept the State's concession that it was error for the trial court to admit Mr. Anderson's statements to police.

The State argues that the error was harmless. Admission of an involuntary confession obtained in violation of *Miranda* is subject to treatment as harmless error. *State v. Reuben*, 62 Wn. App. 620, 626-27, 814 P.2d 1177 (1991) (citing *Arizona v. Fulminante*, 499 U.S. 279, 292 & n.6, 111 S. Ct. 1246, 113 L. Ed. 2d 302, *reh'g denied*, 500 U.S. 938, 111 S. Ct. 2067, 114 L. Ed. 2d 472 (1991)). To find an error affecting a constitutional right harmless, we must find it harmless beyond a reasonable doubt. *Fulminante*, 499 U.S. at 295; *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020, 106 S. Ct. 1208, 89 L. Ed. 2d 321 (1986).

Mr. Anderson's alleged statements to police that he went to his mother's house because he was cold and hungry and was involved in an exchange with a person at 1616 North Cedar were the only clearly sufficient evidence of a violation of the no-contact order. Had those statements been excluded (as they should have been), the next strongest evidence that he violated the no-contact order was Mr. Delp's identification.

Mr. Delp's testimony did not establish guilt beyond a reasonable doubt. He "couldn't be for sure" that Mr. Anderson was the prowler he confronted, because the prowler had a hat and bandana obscuring his features. RP at 94. Mr. Delp identified Mr. Anderson by his clothing, but the clothing he described—blue jeans, a dark jacket, a black baseball cap with an orange insignia, and a backpack—was not unusual male attire for a winter morning. It would not be surprising to have several or even more individuals in similar attire in an urban location on a given day. Mr. Delp also acknowledged that he

15

viewed the suspected prowler for only 10 seconds in early morning light, and that during the showup, Mr. Anderson was presented a half block away as Mr. Delp stood on his porch. He did not identify Mr. Anderson's knife.

Officer Winters's testimony that he located Mr. Anderson within the area prohibited by the no-contact order also fell short of proof beyond a reasonable doubt. Mr. Anderson's presence in the general vicinity of his mother's home was not itself suspicious, since the defense presented evidence that Mr. Anderson grew up in the neighborhood, where his mother had lived for 30 years. It presented evidence that he had friends in the neighborhood. It was unclear that the location where Officer Winters stopped Mr. Anderson was within two blocks of the Curtis home and, given Mr. Anderson's possible understanding of "two blocks" as measured not by trespassing, but by traveling on sidewalks or streets, it was even less clear that he was "knowingly" within two blocks of his mother's home.

Least probative was the limited extent to which Officer Spolski was able to match Mr. Anderson's shoes to footprints in the snow at the Curtis home. All the officer was able to do was compare the *size* of Mr. Anderson's shoe with photographs of the footprints taken by another officer. He did not testify that Mr. Anderson wore an unusual size shoe. No shoe tread was visible in the crusty snow. And defense counsel obtained the officer's concession that the Curtis home was located in what could be a high crime area.

16

Because the error was not harmless, retrial is required.[5]

*The State's misleading argument that "whatever we do, we do intentionally"*
*should not be repeated on retrial*

Given our remand for retrial, it is unnecessary to address Mr. Anderson's remaining assignments of error. We choose to address the prosecutor's misleading argument about the relationship between intentional conduct and knowledge to avoid any recurrence of that error on retrial.

The jury was instructed that it is an element of the crime of violating a no-contact order that the defendant "knowingly violated" the order. CP at 24 (Jury Instruction 9). It was given the following instruction on acting "knowingly":

> A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he or she is aware of that fact, circumstance, or result. It is not necessary that the person know that the fact, circumstance, or result is defined by law as being unlawful or an element of a crime.

> If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact.

> When acting knowingly as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally as to that fact.

---

[5] The State suggests that the remedy should be remand for a new CrR 3.5 hearing. It provides no authority that its failure to present sufficient evidence of adequate *Miranda* warnings in the CrR 3.5 hearing should be remedied by giving it a second CrR 3.5 hearing.

17

CP at 22 (Jury Instruction 7).

The instruction on acting "knowingly" is based on a pattern instruction, WPIC 10.02. 11 WASHINGTON PRACTICE JURY INSTRUCTIONS: CRIMINAL 10.02 at 222 (4th ed. 2016) (WPIC). The comment to WPIC 10.02 highlights the very problem that was presented by the prosecutor's argument in the trial below that "whatever we do, we do intentionally." RP at 164.

An earlier version of WPIC 10.02 stated, "Acting knowingly or with knowledge also is established if a person acts intentionally." 11 WPIC 10.02 at 223. In *State v. Goble*, 131 Wn. App. 194, 126 P.3d 821 (2005), this court found error in the earlier language because inferring knowledge from intent is valid only if required mental states are being evaluated with respect to the same fact. Following *Goble*, the last paragraph of the pattern instruction was revised to include the "knowledge as to a particular fact . . . intentionally as to that fact" qualifier.

*Goble* held that one could not infer the essential element of a defendant's knowledge that his assault victim was a law enforcement officer from the intentional nature of the assault. In this case, jurors could not infer the essential element of a "knowing" violation of the no-contact order from the fact that walking is an intentional act. They could only infer Mr. Anderson's "knowing" violation of the no-contact order if he intentionally violated the no-contact order.

The prosecutor's argument that "whatever we do, we do intentionally" with the example of responding to a jury summons, was misleading and constituted prosecutorial misconduct. The erroneous argument should not be made in any retrial.

We reverse the conviction and remand for proceedings consistent with this opinion.[6]

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Fearing, J.

---

[6] Mr. Anderson asks this court not to impose appellate costs on him if the State substantially prevails. It has not substantially prevailed.